1. Pursuant to P.L. NO. 103–296, the Social Security Independence and Program Improvements Act of 1994, the function of the Secretary of Health and Human Services in Social Security cases was transferred to the Commissioner of Social Security effective March 31, 1995. In accordance with section 106(d) of P.L. 103–296,

**Marjorie M. OWEN, Plaintiff,**

v.

**Shirley S. CHATER, Commissioner of Social Security,[1] Defendant.**

**Civil Action No. 94–1147–FGT.**

United States District Court, D. Kansas.

Oct. 31, 1995.

Shirley S. Chater, Commissioner of Social Security, is substituted for Donna E. Shalala, Secretary of Health and Human Services, as the defendant in this action. Nevertheless, the body of this opinion refers to actions by the Secretary, who had jurisdiction at all times relevant to this case.

David H.M. Gray, Hiebsch, Gragert, Hiebert, Gray & Davisson, Wichita, for plaintiff.

Stephen K. Lester, Office of United States Attorney, Wichita, KS, for defendant.

### MEMORANDUM AND ORDER

THEIS, District Judge.

This matter is before the court on plaintiff's motion for judgment reversing the decision of the Secretary of Health and Human Services which denied plaintiff disability benefits. (Doc. 13). The defendant opposes plaintiff's motion and moves for an affirmance of the Secretary's decision. (Doc. 15).[2]

On August 12, 1992, plaintiff filed an application for disability benefits under Title II, 42 U.S.C. §§ 401 et seq. and Title XVI, 42 U.S.C. §§ 1381 et seq. (Tr. 25–28). The Secretary denied plaintiff's claim initially and on reconsideration. (Tr. 53–56; 68–70). Plaintiff waived her right to an administrative hearing. (Tr. 71–72). On November 13, 1993, the Administrative Law Judge ("ALJ") issued a ruling finding that plaintiff was not disabled within the meaning of the Social Security Act. (Tr. 10–22). The Appeals Council denied plaintiff's request for review. (Tr. 4–5). Thus, the decision of the ALJ rests as the Secretary's final determination.

The plaintiff was born on September 29, 1930. (Tr. 13). She has a high school diploma and a nursing degree, which she earned in 1951. (Tr. 94). Plaintiff is married and has four grown children. (Tr. 194). Plaintiff worked as a registered nurse from September 1949 to August 1991, the alleged onset date of disability.

The plaintiff suffers from a variety of physical impairments, including hypertension, migraine headaches, fibromyalgia, irritable bowel syndrome, history of acute viral hepatitis and acute viral syndrome, and phlebitis. (Tr. 14). Plaintiff has also complained of vision problems, specifically blurred vision and "floaters" in her eyes. (Tr. 73, 93). Finally, plaintiff claims that her ability to remember has been impaired since an illness in March 1990.

On March 8, 1990, plaintiff went to the emergency room, complaining of fever, chills, nausea, a persistent cough, and weakness. (Tr. 148). Plaintiff was hospitalized and was diagnosed with acute cytomegalic viral syndrome. (Tr. 146). Secondary diagnoses included acute viral hepatitis and acute viral syndrome. (Tr. 146). For several days, plaintiff experienced nausea, and her fever spiked to as high as 103 degrees. (Tr. 146). Plaintiff was treated initially with intravenous antibiotics, until it was decided that she suffered a viral infection. (Tr. 146). Thereafter, plaintiff continued to receive intravenous fluids for hydration and intravenous antacids. (Tr. 146). Plaintiff began to feel better and was discharged from the hospital on March 20, 1990. (Tr. 147).

Plaintiff followed up with Dr. Keck Hartman on April 6, 1990. (Tr. 171). At that time, she was slowly improving, but continuing to experience some weakness in her legs and epigastric pain, which was controlled with Zantac. (Tr. 171). In a letter to Dr. Argosino, Dr. Hartman stated that he ex-

---

**2.** The Tenth Circuit, in *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1579 n. 29 (10th Cir.1994), disapproved of the motion practice followed in this district pursuant to D.Kan.Rule 503. The court has changed D.Kan.Rule 503 (now Rule 83.7) to comply with the holding in *Olenhouse* and to conform with Fed.R.App.P. 15. Although motions and supporting memoranda were filed in this case before the rule change, the court attaches no legal significance to the titles the lawyers have given their filings and instead looks to the substance of the documents, which comply in every material way with the requirements of the Social Security Act and the Federal Rules. As it has always done, the court intends to follow the well-established standard of review for Social Security appeals and to rely only on the evidence found within the administrative record.

pected a full recovery within several days or weeks. (Tr. 171–72).

Since her hospitalization, plaintiff has continued to seek treatment for muscle aches, headaches, intestinal problems and fatigue. (Tr. 173–93). Plaintiff was hospitalized twice for tests (colonoscopy and gastroscopy) in October 1991. (Tr. 191–92).

Plaintiff underwent a consultative eye examination performed by Dr. Rodney Hamblin, O.D., on January 14, 1993. (Dr. 207). Dr. Hamblin found that plaintiff's vision was correctable to 20/20 in each eye. (Tr. 207). Dr. Hamblin stated that some of the floaters plaintiff describes could be explained by a vitreal detachment, which was found in November 1989. (Tr. 207).

Dr. Frederick Wolfe saw plaintiff on May 18, 1993, for treatment of her symptoms. (Tr. 216). Dr. Wolfe diagnosed fibromyalgia and prescribed amitriptyline and an exercise program. Dr. Wolfe was asked to assess plaintiff's residual functional capacity ("RFC"). Dr. Wolfe responded that he was unable to do so. (Tr. 225). He stated that it is more important to look at what the patient has in fact been able to do than to ask a physician what she can do. (Tr. 225). Dr. Wolfe added that "[p]atients with fibromyalgia generally have a great deal of difficulty in standing, lifting and carrying, sitting, ..." (Tr. 225).

Dr. Rodolfo Argosino has been plaintiff's treating physician for a number of years. Dr. Argosino completed an RFC form on which he stated that plaintiff can lift about five pounds, can walk, stand or sit for about thirty minutes, that plaintiff can never climb, that her impairments limit her ability to reach, handle, feel, push/pull, see, hear, and speak, and that her impairments restrict her ability to work at heights, around moving machinery, temperature extremes, chemicals, dust, noise, fumes, humidity, and vibrations. (Tr. 239–40).

Also in the record is an RFC assessment performed by Dr. Gihan Kader. Plaintiff was referred to Dr. Kader by Dr. Argosino, but it is unclear whether this related to plaintiff's physical impairments or her mental impairment. (Tr. 235). Dr. Kader opined

that plaintiff can sit, stand or walk for up to eight hours at one time, that there is no restriction on her ability to lift, that her ability to push/pull and perform other manipulations is unlimited, and that there are no environmental restrictions. (Tr. 236–37).

Dr. Haveheer, consulting for the Social Security Administration, completed an assessment of plaintiff's RFC. (Tr. 30–37). Dr. Haveheer stated the opinion that plaintiff could lift up to fifty pounds occasionally and twenty-five pounds frequently, and that she could sit, stand, and/or walk up to six hours in an eight hour day. (Tr. 31). According to Dr. Haveheer, plaintiff's ability to push and/or pull was unlimited, and she had no postural, manipulative, visual, communicative, or environmental limitations. (Tr. 31–34).

The Social Security Administration also consulted a psychologist, Dr. Schulman, to evaluate plaintiff's mental residual functional capacity. (Tr. 38–40). In Dr. Schulman's opinion, plaintiff's ability to maintain attention and concentration for extended periods of time and her ability to work at a consistent pace for a normal workday without unreasonable rest breaks and without interruptions from psychologically based symptoms were moderately limited. (Tr. 38–39). According to Dr. Schulman, plaintiff's mental condition posed no other limitations. (Tr. 38–39). Dr. Schulman described plaintiff as cooperative and alert, but noted deterioration in her attention, concentration, and memory. (Tr. 40). Dr. Schulman concluded that plaintiff's intelligence was in the low average range and that she would be "capable of relating in work activities of less demanding nature than her previous work level." (Tr. 40).

The plaintiff was examined by a consulting psychologist, Dr. Gary Hackney, in September 1992. Plaintiff reported to him that she suffered deterioration of her cognitive functioning and memory. (Tr. 194). Dr. Hackney determined that plaintiff's intelligence was in the low average range. (Tr. 195). Tests revealed difficulty in attention to detail and ability to focus. (Tr. 195). The Weschler Memory Scale also revealed a problem with attention and concentration. (Tr. 195).

Dr. Hackney concluded that what plaintiff had described as a memory problem was not so much a problem with retaining information, but with incorporating material initially. (Tr. 196). Dr. Hackney found plaintiff's cooperation and attitude to be excellent. (Tr. 196). Dr. Hackney stated that there is no doubt that plaintiff's functioning has deteriorated, probably as a result of the high fever. (Tr. 196). He diagnosed adjustment disorder with depressed mood. (Tr. 197).

Dr. Hackney noted that plaintiff's prior work was extremely detailed and that even a little deterioration would cause problems in such a demanding field as registered nursing, but that she could function quite well in a number of other occupations. (Tr. 196). Dr. Hackney noted that plaintiff was not psychologically impaired at home. (Tr. 196). He found that plaintiff would be able to relate appropriately with coworkers and supervisors, that she would be able to understand and perform simple tasks in an average amount of time, that she could keep a work schedule, and that she could sustain concentration in routine activities for eight hours. (Tr. 196).

Plaintiff waived her right to a hearing before the ALJ. (Tr. 73). Plaintiff explained that she becomes upset in unfamiliar surroundings, which brings on nausea and diarrhea associated with irritable bowel syndrome and also causes increased floaters in her eyes and blurs her vision. (Tr. 73). Plaintiff went on to describe her symptoms, including pain in her arms and shoulders and leg cramps. (Tr. 73). Plaintiff noted a deterioration in her ability to remember and reported that she must write notes to herself. (Tr. 75). Plaintiff stated that she quit her job because she did not feel secure in performing any duties outside her routine duties at home. (Tr. 75).

Plaintiff completed a form outlining her daily activities. (Tr. 80–86). Plaintiff cares for her own personal needs, but reported that she does so at a much slower pace and must check several times to keep track of what she is doing. (Tr. 80). As for housework, plaintiff does one chore per day at a slow pace in addition to cooking. (Tr. 81). Plaintiff does some shopping with her husband, pays bills, does a little gardening, and does laundry. (Tr. 81–82). Plaintiff stated that she is less active than she used to be and she is tired after doing much of anything. (Tr. 80). Plaintiff can drive on familiar routes, but her husband does most of the driving. (Tr. 82). Plaintiff visits family members once a week for one to two hours, talks on the phone and writes letters. (Tr. 83). Plaintiff attends church weekly, fishes with her husband once or twice a season, and goes out to eat one to two times per month. (Tr. 83–84).

Plaintiff reported that she sleeps only one hour at a time and is then awakened by leg cramps. (Tr. 85). She sleeps three to four hours per night and spends up to one hour in bed during the day. (Tr. 85).

A statement by plaintiff's husband appears in the record. (Tr. 87). He noted the deterioration in plaintiff's memory, her difficulty climbing stairs, and that she fatigues easily. (Tr. 87). Plaintiff's husband reported that when plaintiff drives, she becomes tired and confused. (Tr. 87).

The Administration contacted plaintiff's former supervisor, Marie Blomstead. (Tr. 88). Blomstead reported that after her illness, plaintiff could not keep up with the hospital's fast pace. (Tr. 88). Plaintiff worked fewer hours. (Tr. 88). Plaintiff needed reminders about procedures and often requested verification of her work to prevent mistakes in giving medications or performing other procedures. (Tr. 88).

The record includes a vocational information form which lists jobs the Administration's examiner found were within plaintiff's residual functional capacity. (Tr. 52). The examiner found that the following occupations were routine jobs which the plaintiff could perform: kitchen helper; food service worker; hand packager. (Tr. 52).

The ALJ found that plaintiff has not engaged in substantial gainful activity since August 5, 1991, the alleged onset date of disability. (Tr. 18). The ALJ determined that plaintiff suffers a combination of severe impairments, but that these impairments do not prevent plaintiff from performing her past relevant work. (Tr. 18). The ALJ

found that plaintiff could lift no more than 50 pounds, could not bend, reach or climb, could do only moderate stooping, squatting or twisting, and could not work at heights, around machinery or in temperature extremes. (Tr. 18).

The ALJ concluded that plaintiff's claims of disabling pain and fatigue were not fully credible because they were "out of proportion with the totality of the evidence." (Tr. 16–17). The ALJ noted plaintiff's level of daily activities, in particular that she walks one mile each day. (Tr. 17). The ALJ also rejected the opinion of Dr. Argosino, one of plaintiff's treating physicians, regarding plaintiff's exertional limitations on the ground that the opinion was not based on objective medical evidence. (Tr. 17). The ALJ suggested that the limitations set forth by Dr. Argosino represented the minimum plaintiff could do rather than the maximum. (Tr. 17).

The ALJ considered the report of the consulting psychologist and determined that plaintiff had a severe combination of mental impairments. The ALJ found, however, that plaintiff could perform semi-skilled or unskilled work. (Tr. 17). The ALJ found that plaintiff had only a slight memory loss attributable to the viral infection, but that it only slightly affected her daily activities because she coped well with reminder notes. (Tr. 17). The ALJ determined that plaintiff suffers minimal distraction of concentration or pace. (Tr. 17).

The Secretary uses a five-step process for deciding whether a Social Security claimant is disabled. The Tenth Circuit Court of Appeals summarized the process as follows:

> In evaluating an applicant's condition to determine whether a disability exists, a series of questions are asked in turn. *See* 20 C.F.R. 404.1520(a) etc. If the claimant is presently pursuing work that constitutes gainful activity, then that person is not disabled, even if medically impaired. If the claimant is not presently doing substantial gainful activity, then the question is asked—does the claimant have a severe impairment which significantly limits his physical or mental ability to do basic work activities? If not, there is no disability. If the claimant has a severe impairment, then the question is asked—does that impairment meet or equal a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1? If so, and if it has lasted or can be expected to last for at least 12 months, the person is considered disabled and there is no need to proceed further. If the impairment does not meet or equal a listed impairment, then the question is asked whether the impairment, when considered along with the applicant's residual functional capacity and the physical and mental demands of the job, prevent the applicant from doing past relevant work? If not, then there is no disability. If, however, claimant can not return to past work, the final question is whether the residual functional capacity, age, education, and work experience allow the performance of other work. If not, a finding of disability will be made.

*Kemp v. Bowen,* 816 F.2d 1469, 1474–75 (10th Cir.1987). This case was decided on the basis of the fourth step.

 The standard of review in this case is established by 42 U.S.C. § 405(g), which provides that "[t]he findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive...." Substantial evidence is that evidence which a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales,* 402 U.S. 389, 402, 91 S.Ct. 1420, 1428, 28 L.Ed.2d 842 (1971); *Fowler v. Bowen,* 876 F.2d 1451, 1453 (10th Cir.1989). It is not the duty of the court to reweigh the evidence, or substitute its decision for that of the ALJ. *Talbot v. Heckler,* 814 F.2d 1456, 1461 (10th Cir.1987). Substantial evidence, however, must be more than a mere scintilla. *Perales,* 402 U.S. at 403, 91 S.Ct. at 1428. This court's determination entails a review of "the record as a whole, and 'the substantiality of the evidence must take into account whatever in the record fairly detracts from its weight.'" *Talbot,* 814 F.2d at 1461 (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951)). In applying these standards, the court must keep in mind that the purpose of the Social Security Act is to ameliorate some

of the rigors of life for those who are disabled or impoverished. *Dvorak v. Celebrezze,* 345 F.2d 894, 897 (10th Cir.1965).

■ The court concludes first that there is not substantial evidence to support the ALJ's step four determination. Every professional who examined plaintiff for her mental condition concluded that she would be unable to return to the demanding work of a registered nurse. The ALJ noted the deterioration in plaintiff's ability to concentrate. As plaintiff stated, lives depend on nurses performing their duties accurately. (Tr. 86). Furthermore, according to the ALJ's own opinion, the plaintiff is able to perform only semi-skilled and unskilled work. There is not any evidence in the record to support a determination that plaintiff's past work as a registered nurse qualifies as semi-skilled or unskilled work. The ALJ's conclusion that plaintiff can return to her previous work appears to be inconsistent not only with the evidence in the record, but also with the ALJ's own determinations of plaintiff's mental abilities. In sum, the ALJ erred in deciding this case at step four because there is not substantial evidence that plaintiff can return to her past work.

■ The court must remand for a step five determination of whether there is other work which plaintiff can perform. At this step, the burden is on the Secretary to show that there is work in the national economy that the plaintiff could perform, taking into account her residual functioning capacity, age, education, and work experience. *Williams v. Bowen,* 844 F.2d 748, 751 (10th Cir.1988). The plaintiff has alleged several other errors which are relevant to the step five determination as well as the step four determination.

Plaintiff argues that the ALJ improperly analyzed her pain. The Tenth Circuit Court of Appeals described the procedure for analyzing pain as follows:

If a pain-producing impairment is demonstrated by objective medical evidence, the decision maker must consider the relationship between the impairment and the pain alleged. "[T]he impairment or abnormality must be one which 'could reasonably be expected to produce' the *alleged* pain." At this stage, the decision maker takes the subjective allegations of pain as true in determining whether they are reasonably related to the proven impairment. He does not evaluate the claimant's credibility. If the nexus between impairment and pain alleged is insufficient, the claimant cannot receive benefits based upon disabling pain. If an appropriate nexus does exist, the decision maker must then consider all the evidence presented to determine whether the claimant's pain is in fact disabling. This evidence includes the medical data previously presented, any other objective indications of the degree of the pain, and subjective accounts of the severity of the claimant's pain. Only at this point may the decision maker decide whether he believes the claimant's assertions of pain.

*Luna v. Bowen,* 834 F.2d 161, 163 (10th Cir.1987) (citations omitted).

■ The first step requires only a loose nexus between the alleged pain and the medical evidence. "[I]f an impairment is reasonably expected to produce *some* pain, allegations of *disabling* pain emanating from that impairment are sufficiently consistent to require consideration of all relevant evidence." *Id.* at 164. In this case there is no dispute that plaintiff has a medically diagnosed condition that is reasonably expected to produce pain.

■ At the second step, the ALJ is to consider several factors, including the claimant's credibility, persistent attempts to find relief, willingness to try any treatment prescribed, regular contact with physicians, daily activities, medication, and psychological disorders. *Id.* at 165–66.

The plaintiff in this case has been diagnosed with an impairment, fibromyalgia, which causes pain. The ALJ was therefore obligated to examine all the factors relevant to a determination of whether the plaintiff's pain is disabling. Here, the ALJ listed the relevant factors, but if he considered all those factors, it is not apparent from the record. Rather, it appears that the ALJ considered only the factors which weighed against plaintiff's claim.

Furthermore, in assessing those factors, the ALJ distorted the evidence and ignored evidence which was favorable to the plaintiff. For example, the ALJ discounted plaintiff's credibility on the basis of her "fairly good range of activities of daily living" and the fact that no doctor had restricted her activities. The ALJ's finding that plaintiff's daily activities are inconsistent with her claims represents a distortion of the record. Although plaintiff walks one mile a day and does household chores, the record reflects that she performs these activities at a much slower pace and has to check and recheck her work due to the deficit in her ability to concentrate. Plaintiff's regular activities include visiting family members, writing letters, talking on the phone, watching television and reading. The evidence also shows that plaintiff fatigues after much of any activity. A claimant's ability to engage in limited daily activities is not inconsistent with the inability to perform substantial gainful activity. As this court has previously held, a disability claimant need not show that she is completely incapacitated to receive benefits. *Jones v. Sullivan*, 804 F.Supp. 1398, 1405 (D.Kan.1992).

The ALJ also ignored factors which weigh in favor of plaintiff's credibility. Plaintiff has a long and steady work record. Plaintiff worked forty years in a demanding profession. In fact, she was employed by the same hospital for thirty-five years. After plaintiff's illness, she returned to work, trying to cope for more than a year by reducing her hours and having others check her work. Several of the doctors who examined plaintiff remarked on her cooperative attitude. None of the physicians who has examined plaintiff has questioned her motivation. The ALJ erred in selecting only that evidence which was unfavorable to the plaintiff and in distorting the evidence to support a denial of benefits. *Id.* at 1406.

Plaintiff next argues that the ALJ erred in giving more weight to the opinions of the consulting physicians than to the opinions of the plaintiff's treating physicians. The Secretary is to give great weight to the opinions of a claimant's treating physician, unless reasons are specified for rejecting the treating physician's diagnosis. *Byron v. Heckler*, 742 F.2d 1232, 1235 (10th Cir.1984). "[T]he reports of physicians who have treated a patient over a period of time ... are given greater weight than are reports of physicians employed and paid by the government for the purpose of defending against a disability claim." *Broadbent v. Harris*, 698 F.2d 407, 412 (10th Cir.1983). In this case, the ALJ rejected Dr. Argosino's assessment of plaintiff's residual functional capacity, believing it was based on the plaintiff's allegations rather than the objective medical evidence. Substantial evidence does not support the ALJ's finding. That a treating physician's opinion is consistent with the plaintiff's complaints is not a sufficient reason to reject that opinion. *See Ratliff v. Shalala*, 1993 WL 405941 at *4 (D.Kan. 1993); *Hejny v. Shalala*, 1993 WL 153204 at *6 (D.Kan.1993). Dr. Argosino's opinion is consistent with a diagnosis of fibromyalgia and with Dr. Wolfe's statement that "[p]atients with fibromyalgia generally have a great deal of difficulty in standing, lifting and carrying, sitting, ..." (Tr. 225). Dr. Wolfe declined to assess plaintiff's residual functional capacity, stating that it is more helpful to look at what the plaintiff actually has been able to do. (Tr. 225). The plaintiff's daily activities since she has stopped working are consistent with Dr. Argosino's assessment of her residual functional capacity. Finally, there is no evidentiary support for the ALJ's speculation that Dr. Argosino's opinions about plaintiff's physical limitations represent the plaintiff's minimum functional capacity rather than the maximum. The questions on the form were clear, and there is no evidentiary basis for the ALJ's suspicion that Dr. Argosino misread them. On remand, the ALJ shall properly consider the opinions of plaintiff's treating physicians.

On remand, a hearing will be necessary to determine whether there are any jobs existing in significant numbers in the national economy which plaintiff can perform. The plaintiff may wish to reconsider whether to waive her right to a hearing before the ALJ. The ALJ shall give plaintiff the opportunity to testify regarding the step five determination if she chooses. The court believes that

some of the errors in this case stem from the lack of an administrative hearing.

For the foregoing reasons, the court reverses the decision of the ALJ and remands the case for a step five determination. On remand, the ALJ shall properly analyze plaintiff's claims of pain, without distorting the evidence or ignoring select evidence. The ALJ shall afford proper weight to the opinions of plaintiff's treating physicians. Finally, the ALJ shall consider the plaintiff's new evidence to the extent that it is relevant to her claim.

**IT IS BY THIS COURT THEREFORE ORDERED** that plaintiff's motion for judgment or, in the alternative, for remand (Doc. 13) is hereby granted in part.

**IT IS FURTHER ORDERED** that defendant's motion to affirm (Doc. 15) is hereby denied.

The decision of the Secretary is reversed and this action is remanded to the Secretary for further proceedings consistent with this opinion.