**Larry A. GRAHAM, Plaintiff,**

v.

**Louis W. SULLIVAN, Secretary of Health and Human Services, Defendant.**

No. 91–4078–C.

United States District Court, D. Kansas.

March 20, 1992.

Robert E. Tilton, Tilton & Hoffman, Topeka, Kan., Gerald Benjamin, Levine, Benjamin, Tushman, Bratt, Jerris and Stein, P.C., Southfield, Mich., for plaintiff.

Jackie A. Rapstine, U.S. Attorney's Office, Topeka, Kan., for defendant.

## MEMORANDUM AND ORDER

CROW, District Judge.

This is an action to review [42 U.S.C. § 405(g)] the Secretary's denial of social security disability benefits to plaintiff, Larry A. Graham. The case is ready for decision on the plaintiff's motion for summary judgment (Dk. 8) and on the Secretary's motion to affirm (Dk. 13).

On June 1, 1988, the plaintiff filed his second application for disability benefits under Title II. He alleged that as of May 30, 1981, he suffered from disabling, "permanent injury to both ankles." The plaintiff's claim was denied initially and on reconsideration. Following a hearing held May 3, 1989, the administrative law judge ("ALJ") issued his decision finding that the plaintiff was not disabled at any time before March 31, 1987 and through June 30, 1989, the date of his decision. On November 28, 1989, the Appeals Council remanded the case to the ALJ for further proceedings and a new decision as the ALJ had not fully considered the opinion of the plaintiff's treating physician and the plaintiff's need to elevate his feet.

On remand, the ALJ conducted a supplemental hearing on April 4, 1990, and issued his decision on May 11, 1990 again denying the plaintiff disability benefits. The ALJ specifically discredited the treating physician's opinion and the plaintiff's testimony that plaintiff's feet needed to be elevated after periods of sitting. On March 12, 1991, the Appeals Council denied plaintiff's request for review. Consequently, the ALJ's decision stands as the Secretary's final decision.

The court's standard of review is set forth at 42 U.S.C. § 405(g), which reads that "the finding of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence is more than a scintilla and is that evidence which a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401–02, 91

S.Ct. 1420, 1427–28, 28 L.Ed.2d 842 (1971); *Ray v. Bowen,* 865 F.2d 222, 224 (10th Cir.1989). The court's duty to assess whether substantial evidence exists:

> "is not merely a quantitative exercise. Evidence is not substantial 'if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion.' "

*Gossett v. Bowen,* 862 F.2d 802, 805 (10th Cir.1988) (quoting *Fulton v. Heckler,* 760 F.2d 1052, 1055 (10th Cir.1985)). Although the court is not to reweigh the evidence, the findings of the Secretary will not be mechanically accepted. *Claassen v. Heckler,* 600 F.Supp. 1507, 1509 (D.Kan.1985). Nor will the findings be affirmed by isolating facts and labelling them substantial evidence, as the court must scrutinize the entire record in determining whether the Secretary's conclusions are rational. *Holloway v. Heckler,* 607 F.Supp. 71, 72 (D.Kan.1985).

The Social Security Act provides that an individual "shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy...." 42 U.S.C. § 423(d)(2)(A). Claimant has the burden of proving a disability that prevents him from engaging in his prior work for a continuous period of twelve months. The burden then shifts to the Secretary to show that the claimant retains the ability to do other work activity and that jobs the claimant could perform exist in the national economy. *Sorenson v. Bowen,* 888 F.2d 706, 710 (10th Cir.1989). The Secretary satisfies this burden if substantial evidence supports it.

■ For evaluating a claim of disability, the Secretary has developed a five-step sequential process. *Bowen v. Yuckert,* 482 U.S. 137, 140, 107 S.Ct. 2287, 2290–91, 96 L.Ed.2d 119 (1987). Step one is whether the claimant is currently engaged in substantial gainful activity. If not, the next consideration is whether "the claimant has a medically severe impairment or combination of impairments." *Yuckert,* 482 U.S. at 141, 107 S.Ct. at 2291. Step three entails determining whether the impairment is equivalent to one of a number of impairments listed in the "Listing of Impairments," 20 C.F.R. Part 404, subpt. p, app. 1 which the Secretary acknowledges are so severe as to preclude substantial gainful activity, 20 C.F.R. § 416.920(d). If no equivalency, the claimant must show that because of the impairment he is unable to perform his past work. 20 C.F.R. § 416.-920(e). The final step is to determine whether the claimant has the residual functional capacity (RFC) to perform other work available in the national economy, considering such additional factors as age, education, and past work experience. 20 C.F.R. § 416.920(f). This process comes to an end if at any point the Secretary determines the claimant is disabled or not. *Gossett,* 862 F.2d at 805; 20 C.F.R. § 416.-920(a).

In his order of May 11, 1990, the ALJ found:

1. That the claimant met the disability insured status requirements of the Act on May 30, 1981, the date the claimant stated he became unable to work, and continued to meet them through March 31, 1987, but not thereafter.

2. That the claimant has not engaged in substantial gainful activity since May 30, 1981.

3. That the medical evidence establishes that the claimant has bilateral ankle pain and swelling secondary to a history of severe sprain to both ankles; extreme obesity; hypothyroidism well controlled on present medication; psoriasis; peripheral neuropathy; and bilateral ankle instability. Nevertheless, he does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4. That the claimant's subjective complaints of inability to do any work activity on a sustained basis no matter how sedentary due to swelling, pain and numbness in his lower extremities; in particular, his allegation that he must elevate his fee whenever sitting, are not credible or as limiting as alleged based on the medical evidence, and his appearance and testimony at the hearing.

5. That the claimant has the residual functional capacity to perform the exertional and nonexertional requirements of work including lifting and carrying objects weighing up to 10 pounds, and standing or walking about two hours total out of an eight hour work day. The claimant retains the residual functional capacity to perform the sitting contemplated in the definition of sedentary work (20 CFR 404.1545).

6. That the claimant is unable to perform his past relevant work as auto assembler.

7. That the claimant's residual functional capacity for sedentary work is not significantly reduced by his subjective complaints; namely, an alleged need to elevate his feet at all times when sitting.

8. That the claimant is 49 years old, which is defined as a "younger individual" (20 CFR 404.1563).

9. That the claimant has a tenth grade education plus has earned a GED (20 CFR 404.1564).

10. That the claimant does not have any acquired work skills which are transferable to the skilled or semi-skilled work activities of other work (20 CFR 404.1568).

11. Based on an exertional capacity for sedentary work, and the claimant's age, education, and work experience, section 404.1569 and Rule 201.21, Table No. 1, Appendix 2, Subpart P, Regulations No. 4 would direct a conclusion of "not disabled."

12. Although the claimant's additional nonexertional limitations do not allow him to perform a full range of sedentary work, the record as a whole including the medical evidence, the claimant's testimony, and testimony from vocational experts establish there are a significant number of jobs in the national economy which he could perform. Representative occupations include: optical assembler, electrical assembler and security monitor. These occupations represent numerous jobs in the State of Kansas.

13. That the claimant was not under a "disability," as defined in the Social Security Act, as amended, at any time through the date of this decision (20 CFR 404.1520(f)).

The plaintiff's appeal primarily takes issue with the evidence supporting the ALJ's findings at paragraphs four and five.

The plaintiff was born December 24, 1940. He is 5' 10½" tall and weighs 335 lbs. From 1963 to 1981, the plaintiff worked at the General Motors plant in Kansas City. Around the first of May 1981, the plaintiff injured his ankles in an automobile accident. The plaintiff worked the next day until the pain and swelling forced him to go home at noon.

On May 5, 1981, the plaintiff was treated by Dr. Scott Corder who observed swelling in both ankles and diagnosed bilateral contusion sprains. X-rays on the same day revealed no "acute fracture or other abnormality." Dr. Corder prescribed rest, hot soaks, and no work for six days. Dr. Corder saw the plaintiff on May 11th and 15th for continued swelling and pain in the right ankle. Because of the slow improvement, on May 26, 1981, Dr. Corder placed the ankle in a walking cast and gave the plaintiff crutches. X-rays on this day revealed swelling, but no fracture.

On June 15, 1981, two days after the cast was removed, Dr. Corder observed three-plus swelling in the right ankle. He referred the plaintiff to Dr. Sheffer, who saw the plaintiff for the persistent swelling on June 19, 1981. Dr. Sheffer opined that the

plaintiff had a "[r]esolving talofibular ligament sprain" and recommended·that:

I think it is probably still wise to treat this gentleman with crutch bearing, progressive weight bearing as tolerated until his pain and swelling resolves. It is going to be another 4 to 6 weeks before he is able to get inside a shoe and lace it. His activity will have to be regulated according to swelling and pain. Much of this time now should be spent as Dr. Corder had advised in elevation and non-weight-bearing.

On July 8, 1981, Dr. Corder recorded in his notes that the plaintiff's right ankle had not changed and that the prognosis was it would take months to heal. Dr. Corder again recommended keeping weight off the ankle, soaking it, and elevating it.

On July 29, 1981, almost three months after the accident, Dr. William Medlicott examined the plaintiff at the request of the plaintiff's employer. He observed that the right foot and ankle were "extremely swollen and quite tender to touch with considerable restriction of motion." He suggested daily whirlpool treatments "with the possible addition of electrogalvanic stimulation."

The plaintiff was examined by Dr. William Bailey on November 27, 1981. Dr. Bailey reported to the Executive Fund Life Insurance Company that the plaintiff needs crutches to walk and that he had persistent swelling, numbness, tingling and pain in the right ankle. Dr. Bailey concluded that the plaintiff was disabled at the time and needed more time for healing. He also explained: "I would expect the posterior tibial nerve irritation would subside as the swelling went down. If it did not, he might need an operative procedure to release the tarsal tunnel."

On December 3, 1981, plaintiff visited Dr. Corder who recorded that the plaintiff's ankle had not changed significantly and that the prognosis was only "fair for slow healing."

On December 22, 1981, Dr. Medlicott saw the plaintiff a second time and reported his findings and recommendation to the plaintiff's employer. His opinion was that the plaintiff's condition was basically unchanged from July. He reserved his opinion on the plaintiff's recoverability until he reviewed some additional tests. On January 12, 1982, Dr. Medlicott wrote that the tests indicated tarsal tunnel syndrome which is commonly treated with surgical release of the nerve. Dr. Medlicott conditioned any recommendation for surgery upon additional testing that could rule out the possibility of general systemic diseases duplicating the prior results.

The plaintiff was hospitalized for chest pain from February 11, 1982, through February 19, 1982. Dr. Corder recorded the plaintiff's medical history as hypothyroidism, severe ankle injury that has left the plaintiff disabled and fairly sedentary, and chronic psoriasis over the lower extremities. The plaintiff's ankle was x-rayed on February 11, 1982, showing soft tissue swelling. On discharge, plaintiff was diagnosed as having suffered from left pleural effusion possibly secondary to pneumonitis, eosinophilia possibly Loeffler's Syndrome, chronic right ankle sprain, and hypothyroidism.

In February and March of 1982, the plaintiff visited Dr. Corder. On both visits, Dr. Corder noted swelling with the right ankle and recommended dieting.

On May 7, 1982, Dr. Corder dictated a lengthy report to a state agency concerning the plaintiff's condition and the course of treatment. Dr. Corder reported in part:

His course regarding the ankle has been slow with some steady improvement. There was no weight bearing for several weeks and then steadily but every time he would be up on the ankle even for short walks he would have a lot of swelling recur in the ankle.... The patient then had a consultation on 12–24 when his ankle did not continue to improve steadily and somewhat stabilized at a chronically edematous and tender ankle resulting in a limp.

. . . .

At this time the patient's ankle status is essentially that of continued pain, has some difficulty ambulating with a slight limp. He has been actively dieting to reduce the strain on his ankle from his

obesity. However, he has not been very successful in his dieting attempts. His present weight is 300 pounds and his ankle prognosis is still only guarded.

In 1982, Dr. Corder also saw the plaintiff on May 17th, June 28th, August 23rd and November 30th. On each visit, Dr. Corder observed edema caused by chronic ankle sprain and complicated by extreme obesity. On each visit, Dr. Corder recommended more weight loss. In November, Dr. Corder recorded that the ankle sprain was "non-healing."

On December 6, 1982, Dr. Riffel examined the plaintiff on the referral by the General Motors Disability Claims Section. Dr. Riffel reported:

Bilateral ankle pain and swelling. This appears to have worsened in the past eight months. His ankle edema continues to be present and to worsen with any prolonged standing or sitting. The left ankle is worse this year then it was on my last examination [April 6, 1982]. This appears to be due to benign, dependent edema, probably exacerbated by his obesity and his automobile accident.

Dr. Riffel also stated that the plaintiff's extreme obesity was aggravating his ankle edema and pain and the loss of 100 to 150 pounds could improve his condition. Dr. Riffel's final impression was that the plaintiff was not employable with General Motors for these reasons:

I do not feel that he would be able to be engaged in any type of employment with General Motors Corporation. He certainly would not be able to do any type of activity which required standing for longer then an hour or two at a time. He also will not be able to sit at a chair for longer then an hour or two at a time because he will have to have his feet elevated. I do feel that if he could lose the 100–150# his problems may improve and he may be able to be employed at that time.

On October 5, 1983, Dr. Corder saw the plaintiff and recorded that the right ankle had not changed, was tender and painful particularly with cold weather. The plaintiff's weight was 292 pounds. Dr. Corder again instructed the plaintiff to "count calories."

Dr. Corder examined the plaintiff on June 25, 1984. The plaintiff complained of psoriasis on his back and legs and a swollen right ankle. The plaintiff's weight was down to 278 pounds. On October 5, 1984, plaintiff returned to Dr. Corder stating that his right ankle was unstable causing him to fall frequently. Dr. Corder observed swelling and prescribed an ankle brace for the ankle weakness.

On October 8, 1984, Dr. Corder completed a physician's statement of disability form. He stated that the plaintiff was now totally disabled for any occupation as a result of chronic sprain in the right ankle.

On February 16, 1987, Dr. Corder checked the plaintiff's ankle. The plaintiff complained of continued swelling and pain with walking. Dr. Corder observed the right ankle was swollen and had a decreased range of motion. On the same day, Dr. Corder completed a physician's statement of disability form. He stated that the plaintiff had a severe soft tissue injury to his right ankle which disabled the plaintiff indefinitely from any occupation.

On December 23, 1988, Dr. Corder filled out a government form for medically assessing plaintiff's ability to perform work. He commented that the plaintiff could sit so long as his feet were elevated. As for walking, Dr. Corder's opinion was that the plaintiff could walk less than one hour during a work day and less than fifteen minutes without interruption.

The plaintiff testified at the hearing that he can stand comfortably for 30 to 40 minutes, walk comfortably for about the same time, and sit comfortably with his feet on the floor for about 45 minutes to an hour. Longer periods cause serious pain and swelling relieved only by elevating his feet. The plaintiff takes pain medication three or four times a week. The plaintiff is unable to climb stairs and added a bedroom to the ground floor of his home to accommodate his situation. The plaintiff did drive his car 84 miles to the hearing taking only one stop because he was afraid of being late. On a typical day, the plaintiff walks some

around his back yard, rides to town with his wife, and drinks coffee with some friends or visits his wife's business. The plaintiff goes fishing a couple of times a week for approximately an hour each time. Finally, the plaintiff testified that he discontinued regular visits for treatment of his ankle after the physicians told him that there was nothing more they could do for him.

At the first hearing, the ALJ asked the vocational expert that considering all of the plaintiff's conditions and the restrictions caused by his ankle injury whether the plaintiff could engage in alternative employment. The expert testified that plaintiff could do sedentary work such as an optical goods assembler, electronics assembler, or security monitor. On cross-examination, the expert conceded that the plaintiff could not perform sedentary work if there was a requirement for the plaintiff to elevate his feet. At the supplemental hearing, the ALJ asked another vocational expert considering all of the plaintiff's problems with his ankle, including the restriction that the plaintiff elevate his feet every 30 to 45 minutes, whether the plaintiff could perform alternative work. The expert answered that an alternative job did not exist as the plaintiff's need for elevating his feet would interfere with his duties.

█ The plaintiff first contests the ALJ's credibility determination on the plaintiff's need to elevate his feet to alleviate the pain caused by sitting. " '[P]ain testimony should be consistent with the degree of pain that could be reasonably expected from a determinable medical abnormality.' " *Hargis v. Sullivan*, 945 F.2d 1482, 1489 (10th Cir.1991) (quoting *Huston v. Bowen*, 838 F.2d 1125, 1129 (10th Cir. 1988); 42 U.S.C. § 423(d)(5)(A) (1988)). If the impairment can be reasonably expected to cause some pain, then allegations of disabling pain are consistent enough to call for consideration of all pertinent evidence. *Hargis*, 945 F.2d at 1489. The credibility of pain testimony is decided upon these factors:

the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation and relationship between the claimant and other witnesses, and the consistency of or compatibility of nonmedical testimony with objective medical evidence.

*Huston,* 838 F.2d at 1132. The ALJ must make specific findings and state the reasons for disbelieving a plaintiff's subjective testimony. *Kreie v. Bowen,* 656 F.Supp. 765, 769 (D.Kan.1987). In this case, the ALJ expressed the following reasons for doubting the plaintiff's testimony on the need to elevate his feet after sitting for a period: the consistency with medical evidence, daily activities, and "pharmacological regimen." Though deference is accorded an ALJ's credibility determination, *Sorenson v. Bowen,* 888 F.2d at 712, the determination still must be supported by the evidence and not overwhelmed by other pertinent evidence. This inquiry into the evidence is particularly appropriate here since the ALJ has not identified any inconsistencies in the plaintiff's testimony or relied on any subjective measures of credibility that are peculiarly with the ALJ's judgment.

█ The court finds no reasonable basis in the record for the ALJ's credibility determination. First, the plaintiff's subjective testimony on pain and the need to elevate his feet is consistent with, if not fully supported, by the medical evidence. Every examining physician observed swelling in the plaintiff's right ankle. The elevation of extremities for relief of swelling is not a challenged medical proposition. Both Dr. Corder and Dr. Riffel opined that the plaintiff would need to elevate his legs regularly even while seated at a chair. In his decision, the ALJ does not identify what medical evidence is inconsistent with the plaintiff's subjective testimony. Moreover, the court has not found the medical evidence which casts doubt on the plaintiff's complaints of pain and swelling.

The frequency of the plaintiff's visits in 1984 and after does not show a lack of disability for the years of 1981 through 1983. The later infrequency of visits is fully explained by the fact that the plaintiff was told his condition was not medically treatable and that relief would come from limiting his activities and exertion. The level of medication use is also consistent with the plaintiff's testimony. The medical records only reflect that medication required when the plaintiff avoids exertion and regularly elevates his legs to relieve the pain. There is no evidence of how much medication would be required if he were performing sedentary work. In other words, the plaintiff took physical measures, such as elevating his feet and avoiding certain physical activities, which alleviated much of his pain without medication.

The plaintiff's daily activities do not indicate the ability to perform sedentary work. A morning walk in the back yard, a visit to the coffee shop, an occasional fishing trip, a ride into town and an 82–mile trip to the social security hearing with one stop are not circumstances establishing that the plaintiff can engage in sedentary work on a regular basis. *See Gossett v. Bowen*, 862 F.2d at 807; *Cavitt v. Schweiker*, 704 F.2d 1193, 1195 (10th Cir.1983). At best, the plaintiff's activities are limited in exertion and duration. More importantly, the plaintiff never testified that pain, swelling and discomfort did not sometimes accompany or result from these activities and that he did not often relieve that pain by elevating his feet. For these reasons, the court concludes that the ALJ has not articulated specific and reasonable grounds and facts for discrediting the plaintiff's subjective pain testimony.

The ALJ failed to give proper weight to the opinion of Dr. Corder. The opinion of a treating physician is to be accorded substantial weight and not to be disregarded without giving specific, legitimate reasons. *Williams v. Bowen*, 844 F.2d 748, 758 (10th Cir.1988). Surprisingly, the ALJ could find only one written opinion of Dr. Corder which supported the plaintiff's complaint. He then rejected that opinion, which was dated December 23, 1988, because of "a very sketchy medical history inasmuch as Dr. Corder saw the claimant only four times in four to five years." This is not a legitimate reason for rejecting Dr. Corder's opinions throughout his treatment of the plaintiff after May of 1981. In 1981 and 1982, the plaintiff saw Dr. Corder frequently and complained almost each time of ankle problems. The frequency of the plaintiff's visits tapered off in later years as the plaintiff was told that his condition was essentially permanent. Prior to 1984, Dr. Corder stated on several different occasions that the plaintiff was disabled from all work and that he must elevate his feet. Even Dr. Riffel in November of 1982 noted that the plaintiff must elevate his feet after sitting in a chair for longer than a hour. More importantly, the ALJ has pointed to no evidence in support of the proposition that the plaintiff's condition improved from 1982 to 1988. In fact, the medical evidence of record shows the plaintiff's condition remained substantially the same throughout the relevant time period except for some opinions that the plaintiff's condition may even have deteriorated. The ALJ erred in rejecting Dr. Corder's opinion without a specific, legitimate reason.

The ALJ several times referred to physicians' opinions that the plaintiff's ankle would improve if he lost weight. The ALJ, however, never found that this was the same as failing to follow prescribed treatment and that this was cause for denying plaintiff the disability benefits. Despite this absence of findings, the Secretary on appeal refers to the pertinent regulations on failure to follow prescribed treatment in arguing that the plaintiff's ankle was aggravated by his obesity. Because the court is not certain what position the Secretary is taking on the issue of the plaintiff's weight, the court will briefly discuss the case law.

Obesity by itself does not mean the claimant has refused treatment. *McCall v. Bowen*, 846 F.2d 1317, 1319 (11th Cir.1988). Nor does a physician's recommendation to lose weight necessarily constitute a pre-

scribed course of conduct. *Id.* The Fifth Circuit has said this about assuming obesity to be remediable:

> In like disregard of reality, the Secretary continues to hold that a person who is disabled because of obesity has a condition that is per se remediable, without examining the medical condition and personal factors that might make it possible or impossible for a particular disabled person to remedy his obesity. As we held in *Scott v. Heckler* [770 F.2d 482, 486–87 (5th Cir.1985)]:
>
> > Significant weight loss is indeed difficult even for the iron willed. For the less determined, who suffer from other painful and debilitating impairments that restrict movement, and no doubt sap the resolve for self-improvement, such a significant loss of weight may be impossible. Alcoholism may be considered a disabling impairment despite the fact that a doctor has ordered the alcoholic to stop drinking. Whether or not [the claimant] has the ability to control [his] eating habits is at least a fact question, not a matter to be determined by *a priori* judgment, for certain impairments, although initially self-inflicted, may become diseases that either contribute to an overall disability or are of themselves disabling.

*Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir.1987). The ALJ did not consider any of these factors in weighing the testimony of those physicians who opined that the plaintiff's ankles would improve with substantial weight loss. Without these findings and evidence to support them, the Secretary may not summarily conclude the plaintiff's weight condition is remediable.

The Secretary on appeal also argues that the plaintiff failed to follow additional treatment recommended by physicians. Four requirements must exist before benefits may be denied for this reason: "(1) the treatment at issue should be expected to restore the claimant's ability to work; (2) the treatment must have been prescribed; (3) the treatment must have been refused; (4) the refusal must have been without justifiable excuse. *Teter v. Heckler*, 775 F.2d 1104, 1107 (10th Cir.1985). The Secretary has the burden of proving each of these four requirements. *Weakley v. Heckler*, 795 F.2d 64, 66 (10th Cir.1986). The course of treatment must be prescribed, not merely recommended, suggested or abstractly opined. *Teter v. Heckler*, 775 F.2d at 1107. The Secretary has not come forth with substantial evidence to sustain these four requirements. At best, Dr. Bailey and Dr. Medlicott only made recommendations of alternative treatments, including surgery. Indeed, the plaintiff's treating physician, Dr. Corder, never prescribed surgery.

The ALJ's findings in this case are not supported by substantial evidence. A reasonable person would not conclude from the evidence of record that the plaintiff was able to perform sedentary work. As summarized above, several different physicians, most importantly the plaintiff's treating physician, have opined that the plaintiff is totally disabled. Their opinions stand uncontroverted. The plaintiff's activities are consistent with his alleged disability. The reasons given for the ALJ's credibility calls are irrational and belied by the record. The court sees no useful purpose for additional fact finding, so the case is reversed and remanded for an immediate award of benefits based upon the plaintiff's application. *See Sorenson*, 888 F.2d at 713.

IT IS THEREFORE ORDERED that the Secretary's motion to affirm (Dk. 13) is denied, and the plaintiff's motion for summary judgment (Dk. 8) is granted and the Secretary's decision denying benefits is reversed and the case remanded for an immediate award of benefits.